IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MATTHEW BRADEN,

              Petitioner,                No. CIV S-00-1595 RRB GGH P

    vs.

RODNEY HICKMAN, et al.,

              Respondents.         FINDINGS AND RECOMMENDATIONS

_____/

*Introduction and Summary*

       Was petitioner simply an unwitting passenger in a car whose other occupants committed felony murder, or did he facilitate the commission of a robbery culminating in murder?  After evidentiary hearing, involving the testimony of petitioner's co-defendant, in which petitioner attempted to affirmatively show his actual innocence, the court finds that petitioner has not met his burden of proof.  The court also finds that the two remaining claims should be denied.

*Background*

    A.  Procedural

       Petitioner is a state prisoner proceeding through counsel with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 1997 Sacramento

1

1   County conviction of first degree murder (Cal. Penal Code § 187(a)); attempted car jacking (Cal.

2   Penal Code § 664/215(a)); and vehicle theft (Cal. Veh. Code § 10851(a)).   Petitioner sets forth

3   three claims in his petition for writ of habeas corpus: 1) he has new evidence to prove he is

4   actually innocent of the crimes for which he was convicted; 2) the state court erred in finding

5   petitioner guilty under a felony murder theory; and 3) petitioner's right to due process and a fair

6   trial were violated by allowing petitioner's prior conviction into evidence.

7          Petitioner, along with his two co-defendants David Ellis and Joshua Sweitzer,

8   was charged with (1) murder (Cal. Penal Code § 187(a)), while armed (§ 12022(a)), with special

9   circumstances; (2) attempted murder (Cal. Penal Code § 664/187(a)), while armed; (3) attempted

10   carjacking (Cal. Penal Code § 664/215(a)); (4) shooting at an occupied vehicle (Cal. Penal Code

11   § 246); (5) vehicle theft (Cal. Veh. Code § 10851(a)); (6) robbery (Cal. Penal Code § 211); (7)

12   assault with force likely to produce great bodily injury (Cal. Penal Code § 245(a)(1)); and (8)

13   shooting at an occupied dwelling (Cal. Penal Code § 246).   It was further alleged that petitioner

14   committed these crimes while released on bail (Cal. Penal Code § 12022.1(b)).   Ellis was also

15   charged with being a convicted felon in possession of a firearm (Cal. Penal Code § 12021(a));

16   Sweitzer was also charged with possession of a semi-automatic hand gun (Cal. Penal Code §

17   12021(d)).

18          Petitioner testified in his own defense.   Ellis and Sweitzer did not testify.   Witness

19   Cherub Engelleiter and Bryan Lutz testified under a grant of immunity.   A jury convicted Ellis

20   and Sweitzer on all counts and found the special circumstances to be true.   The jury acquitted

21   petitioner on counts six thought eight, but deadlocked on the charges of murder, attempted

22   murder, attempted car jacking, shooting at an occupied vehicle and vehicle theft.

23          On retrial of counts one through five, after the court granted the prosecution's

24   request to utilize evidence of petitioner's prior burglary charge and shooting at an occupied

25   dwelling, petitioner waived his right to a jury trial.   Again, petitioner testified.   Petitioner's

26   defense was that while he was present during the crimes, he was not a participant and had no

2

knowledge the crimes were going to occur.  The court convicted him of murder (on a felony

murder theory), attempted car jacking and vehicle theft, but acquitted him of the attempted

murder and shooting at an occupied vehicle charges.  The court found true that petitioner was

armed during the commission of the murder and that he was on bail when he committed the

offenses.  The court then sentenced him to an indeterminate term of 25 years to life for murder

plus three years for the arming enhancement and vehicle theft.  The court stayed a 30-month

concurrent term for attempted car jacking.

Petitioner appealed on only one ground:  that the trial court admitted prejudicial

character evidence in violation of due process.  This appeal was rejected on January 28, 1999.

The petition for review before the California Supreme Court raising this issue (as a state law

abuse of discretion issue) was denied on April 28, 1999.

A federal habeas petition was filed on July 25, 2000 raising the due process

evidence issue.  Petitioner coupled this filing with a request to stay the petition so that he could

exhaust other claims before the California Supreme Court.  Respondent made no objection to this

request which was therefore granted.  A state habeas petition was filed in which petitioner raised

his claim that "new evidence" negated the basis of the trial court's determination, in essence, an

actual innocence claim.  Petitioner submitted a declaration of one of the co-defendants which

expressed the fact/opinion that petitioner had no knowledge that his two co-defendants were

going to attempt the robbery which culminated in the murder.  Petitioner also complained of

ineffective assistance of counsel.  On June 27, 2001, the California Supreme Court denied this

petition.

Returning to federal court, petitioner filed an amended petition raising the claims

set forth above in the first paragraph.  He moved for an evidentiary hearing on the actual

innocence claim which was granted on March 19, 2004; the undersigned reasoned that an actual

innocence claim was cognizable in federal habeas corpus, and that the co-defendant's written

exoneration had to be tested upon live testimony.  The order for evidentiary hearing was

1   subsequently upheld by the district judge on request for reconsideration.  The evidentiary hearing

2   was held on February 22, 2005, the evidence of which is recounted in detail below.  After an

3   extended time for post-hearing briefing, occasioned in the main by a partial failure of the court's

4   recording system which required the parties to agree on a settled statement of testimony, the

5   entire petition was taken under submission.

6          B.  Substantive

7                  The court gives a summation of the evidence derived form the opinion of the

8   California Court of Appeal.  That summary has been greatly supplemented below as necessary to

9   deal with the issues on this petition.

10             On July 14, 1996, Ellis Sweitzer and 14-year-old Cherub E. went
            to defendant's home.  Ellis wanted to buy a gun and Sweitzer knew
11          defendant had a gun for sale.  Ellis offered tire rims or speakers in
            exchange for the gun.  Defendant claimed he already had a buyer.
12          Defendant wanted $450 for the gun.  Ellis bragged he would "jack"
            a car for the rims.  Defendant already had two sets of rims, one on
13          his truck and the other he could not sell.  The foursome left
            defendant's home in Sweitzer's truck and drove around.  About 7
14          p.m., Ellis and Sweitzer assaulted Wayne Bertelson and stole his
            expensive mountain bicycle and a pager. [FN2]
15
                  [FN2: A jury acquitted defendant on counts six and
16                seven.]

17          At an auto parts store, while defendant and Sweitzer waited in the
            truck, Ellis bought a dent puller which Cherub knew would be used
18          to steal a car.

19          They went to a park where defendant showed Ellis how to take the
            safety off of the gun.  Ellis then shot the gun.
20
            At Sweitzer's request, defendant drove Sweitzer's truck while
21          Sweitzer and Ellis looked for a car.  Soon, Ellis and Sweitzer drove
            up in a gold Mazda. [FN3]
22
                  [FN3: The court convicted defendant on count five.]
23
            Driving Sweitzer's truck, defendant followed Ellis and Sweitzer in
24          the gold car.  The gold car disappeared for more than 15 minutes.
            Ellis claimed he shot at Brian Boss's house.  Six bullets were later
25          found in one of the bedrooms of the house. [FN4]

26                [FN4: The jury acquitted defendant on count eight.]

After dropping Cherub off at her home, defendant drove to Sweitzer's home where defendant got into the back seat of the gold car. Sweitzer drove and Ellis rode in the front passenger seat. Ellis saw a gray car with fancy rims and they followed the car. They pulled alongside and Ellis leaned out and shot Timothy Tallman, the driver. Tallman kept going and then crashed in front of a store. Ellis fired another shot into the car. Ravyn Tallman sat in the front passenger seat and her two children were in the back seat. Timothy Tallman died from his gunshot wound. [FN5]

> [FN5: The court convicted defendant on counts one (murder of Timothy Tallman) and three (attempted carjacking) and acquitted him on counts two (attempted murder of Ravyn Tallman) and four (shooting at an occupied vehicle).]

Sweitzer drove defendant home. Defendant took the gun; he was glad to get it back so he "could get money for it."

Sweitzer and Ellis spent the night with Bryan Lutz and told him what had happened. The next morning, Lutz, Sweitzer and Ellis went to defendant's house. Ellis had a plan for disposing of the stolen car. Defendant rode with a friend and followed but eventually lost sight of Sweitzer's truck. Defendant then attempted to dispose of the gun but could not sell it so he left it with Lutz.

Respondent's Answer, Exhibit 2, pp. 3-5.

_Standards of Review_

There are two applicable standards of review: de novo for the actual innocence claim on which the court held an evidentiary hearing, and the AEDPA deferential standard for the two remaining legal issues.

A. Actual Innocence

After the federal court holds an evidentiary hearing on an issue in a habeas corpus petition, the issue is decided de novo. Killian v. Poole, 282 F.3d 1204, 1208 (9th Cir. 2002). However, in the context of actual innocence, petitioner must understand that "de novo" is a two way street in which each party attempts to prove its case regarding actual innocence. In order to be determined "actually innocent," petitioner must affirmatively prove that he is probably innocent. Jackson v. Calderon, 211 F.3d 1148, 1165 (9th Cir. (2000). This is a standard higher than the already high standard of insufficient evidence to convict (no rational factfinder could

1   have found petitioner guilty on the evidence presented), and has also been characterized as

2   "extraordinarily high."  Carriger v. Stewart, 132 F.3d 463, 476 (9th Cir. 1997) (en banc). The

3   court, in determining actual innocence in habeas corpus, is therefore not limited to any argument

4   that the analysis of the fact finder in the court below was faulty in light of the new evidence;

5   rather, the court is solely focused on the issue whether, in light of all the evidence, including the

6   evidence that petitioner posits as exonerating, petitioner has affirmatively proved his probable

7   innocence.  The court will utilize the correct legal standard under state law regardless of whether

8   that precise standard was utilized in the court below.  In other words, the federal court is not

9   engaged in an analysis of what the state trier of fact would now determine under the analytical

10  methodology previously used (if known) if  afforded the new evidence; the court is engaged in a

11  de novo analysis of petitioner's innocence under governing state law principles.  Petitioner is

12  either probably actually innocent under state law, or he is not—period.

13        B. AEDPA

14        For legal determinations outside petitioner's claim for actual innocence, petitioner

15  also bears a heavy burden in habeas corpus.  In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S.

16  Ct. 1495 (2000), the Supreme Court defined the operative review standard set forth in § 2254(d).

17  Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the

18  court.  There is a dichotomy between "contrary to" clearly established law as enunciated by the

19  Supreme Court, and an "unreasonable application of" that law.  Id. at 1519.  "Contrary to" clearly

20  established law applies to two situations:  (1) where the state court legal conclusion is opposite

21  that of the Supreme Court on a point of law, or (2) if the state court case is materially

22  indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is

23  opposite.

24        "Unreasonable application" of established law, on the other hand, applies to

25  mixed questions of law and fact, that is, the application of law to fact where there are no factually

26  on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

1   Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000).  It is this prong of the

2   AEDPA standard of review which directs deference to be paid to state court decisions.  While the

3   deference is not blindly automatic, "the most important point is that an *unreasonable* application

4   of federal law is different from an incorrect application of law....[A] federal habeas court may not

5   issue the writ simply because that court concludes in its independent judgment that the relevant

6   state-court decision applied clearly established federal law erroneously or incorrectly.  Rather,

7   that application must also be unreasonable."  Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at

8   1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the

9   objectively unreasonable nature of the state court decision in light of controlling Supreme Court

10  authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

11          The state courts need not have cited to federal authority, or even have indicated

12  awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S.

13  Ct. 362  (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is

14  contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An

15  unreasonable error is one in excess of even a reviewing court's perception that "clear error" has

16  occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76 , 123 S. Ct. 1166, 1175 (2003).  Moreover,

17  the established Supreme Court authority reviewed must be a pronouncement on constitutional

18  principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

19  binding only on federal courts.  Early v. Packer, 537 U.S. at 10, 123 S. Ct. at 366.

20          However, where the state courts have not addressed the constitutional issue in

21  dispute in any reasoned opinion, the federal court will independently review the record in

22  adjudication of that issue.  "Independent review of the record is not de novo review of the

23  constitutional issue, but rather, the only method by which we can determine whether a silent state

24  court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

25  2003).

26  \\\\\

1   *Discussion*

2       A. <u>Whether Petitioner Is Actually Innocent of Felony Murder and the Attempted Robbery</u>

3   <u>(Carjacking) Conviction</u>

4           *The Trials*

5           The summary facts given above require supplementation.

6           Petitioner was in possession of a firearm (probably stolen) which he had

7   purchased from a person named Kelso. Cheryl (Cherub) Engelleiter, a friend of defendant

8   Sweitzer, was riding in a car with both defendants Schewitzer and Ellis[1] on July 14, 1996.  At a

9   point late in the evening, the trio arrived at petitioner's (Braden) home whereupon conversation

10  centered about a gun petitioner possessed.  <u>See</u> SCT 13-15.  Petitioner wanted to sell the gun

11  [despite his just having bought it for protection], and Ellis wanted to buy it, but Ellis had no or

12  insufficient money.  Petitioner was offered some rims or speakers for the gun in trade, but

13  petitioner had rims already, and from Engelleiter's testimony, negotiations continued but

14  apparently did not culminate in any agreement at that time.  SCT 17 and 103.  Petitioner testified

15  that he had made a deal with Ellis to sell the gun, and was expecting cash.  SCT 122, 136.

16          A series of events now transpired with petitioner remembering more specifics

17  than the somewhat confused Engelleiter, although the chronology when the testimony of the two

18  witnesses is compared is somewhat jumbled.  The group left petitioner's house and went to an

19  auto parts store to pick up a dent puller to be used during or after an anticipated car theft

20  (petitioner stayed in the truck and ostensibly was unaware of the purpose for the stop). At some

21  point, all proceeded to the Lutz home.  After Ellis could not obtain money from Lutz allegedly

22  owed to Ellis, they eventually left.  Also, before the park incident, the four happened upon a

23  hapless bicyclist, who was beaten up by Ellis and/or Sweitzer, and had his bicycle taken.  The

24  bicycle was taken to petitioner's house.  At this point, Ellis and Sweitzer convinced petitioner to

25

26          [1] For some reason unknown to the undersigned, Ellis' first name in the jury trial was "David," but was "Alex" at the (second) court trial.

8

get the gun (a Tech9 assault weapon), and bring it with them on a "road trip," where they would wind up at Ellis' house in order to get the money.  Petitioner did so because he believed a deal had been made, and the request to go to Ellis' house was just to effectuate the deal. Nevertheless, all four drove to a park in someone's truck, took out the gun, and Ellis commenced firing the gun, although petitioner testified that the gun was never fired.  Engelleiter testified that petitioner assisted Ellis in firing the gun; petitioner denied it.[2]  Ellis and Sweitzer later stole a car outside the presence of petitioner and Engelleiter, but later drove up to petitioner in the car, and had petitioner drive the truck (presumably Sweitzer's) behind them.  Petitioner also testified that Ellis/Sweitzer fired the weapon at another car.  At another pause in the travels that night, petitioner and Engelleiter were again left alone when Ellis and Sweitzer took the gun and shot up the home of another person (Boss) with whom they evidently had a dispute.

At this point Engelleiter was taken home, and the trio now found themselves at Sweitzer's house.  Sweitzer went into his home, but reappeared sometime later, and stated that they all could now go, but not in Sweitzer's truck in order to allay suspicion by Sweitzer's uncle as to Sweitzer's whereabouts.  Petitioner testified that he was reluctant to get into the stolen car, but that was the only way he could get home—petitioner testified that he had been growing increasingly apprehensive about the unpredictable acts of Sweitzer and Ellis, had given up hope about getting paid for the gun at this point, and was willing to write it off.

On the way "home," Ellis and Sweitzer wanted to get some fast food, and while waiting in the drive-in line at Taco Bell, all saw a gray Honda Accord traveling near Fair Oaks and Manzanita.  Petitioner testified that Ellis immediately told Sweitzer to "back-up," and then Sweitzer began to follow the car.  According to petitioner, Ellis remarked to Sweitzer about the rims on the Accord.  Ellis said that he needed to "talk to this guy" in the Accord.  Sweitzer and Ellis followed the car for awhile.  Finally, after some maneuvering, Sweitzer pulled to the side of

---

[2]  This shooting was not part of the charges against petitioner, and the undersigned believes charges were not brought against anyone in connection with this incident.

9

the Accord.  Ellis then pointed the gun at the Accord driver and yelled for the occupants to get out of the car; nevertheless Ellis also immediately fired before the occupants could move.  The Accord kept moving, and about half a minute later, Ellis again fired through the [his] passenger side window.  The driver (Tallman) was killed and his passenger/spouse survived.

Switzer and Ellis, along with petitioner, fled the scene, and finally dropped petitioner off at his house.  Petitioner was given the gun back by Ellis; petitioner took it because he figured he could still get money for the gun, and because he did not want to argue with Ellis after what he just witnessed.  Soon thereafter petitioner and Lutz attempted to sell the gun.  Ellis and Switzer came to petitioner's house the next day, along with Lutz and Kelso (the person who originally sold the gun to petitioner).  All commenced on a trip to burn the stolen car, but petitioner, Lutz and Kelso abandoned this project along the way.  Petitioner gave the gun to his friend Lutz in order to facilitate its sale.  However, the person to whom the gun was going to be sold did not contact the two, and Lutz kept the gun.  Petitioner heard on the news that Ellis and Switzer had been arrested prior to the time that detectives first contacted him.

On cross-examination at the second trial, petitioner conceded that he previously had participated in a prior burglary—a burglary precipitated by information from Switzer.  Guns were taken in that burglary, some of which were then given to Switzer on account of the information given.  The trial court permitted this evidence to show intent or motive on the part of petitioner vis-a-vis the robbery/murder.  Also, the cross-examination established facts from which it could be inferred that petitioner was a "fence" for stolen material.  Finally, at the second trial, the trial judge ruled (at the time a jury trial was still a possibility) that petitioner's active involvement in a previous drive-by shooting (he was the gunman) would be admitted for impeachment purposes.[3]

\\\\\

---

[3] On cross-examination, petitioner stated that he had shot in the air, but not at the house.

1    *The Federal Proceedings*

2         Sweitzer did not testify at petitioner's trials.  However, he did sign a declaration

3    on August 7, 2000 essentially absolving petitioner of any complicity in stealing the Mazda car

4    and of having any knowledge whatsoever about any robbery plan associated with the Honda

5    Accord.

6         11. While we were going through the drive-through, David [Ellis]
           told me to follow a car that was passing by on the adjoining street.
7          There was no conversation in the car about jacking the [other] car.
           There was no conversation in the car about stealing the tire rims on
8          the car to trade for Matthew's [petitioner's] gun.  There was no
           conversation about firing the gun.

9
           12. I followed the car for a few minutes.  When the car started to
10         turn, I drove past it.  At this point, David shot the gun at the car.
           Up to that point, there was no indication that David was going to
11         fire the gun.

12         13.  Matthew never gave any indication that he knew David was
           going to shoot at the car.  Further, he never gave any indication that
13         he wanted David to steal the tire rims to trade for the gun.  If we
           had planned a robbery, we would have spoken about it with him
14         beforehand.  No such conversation ever happened.

15         14.  Matthew did not say anything after the shots were fired,
           except, "oh shit" when he ducked down in the backseat.  I took
16         Matthew straight home after the shooting.  He did not say anything
           during the ride to his house.  He looked like he was in shock.

17

18         At evidentiary hearing, Sweitzer was an enigmatic witness.  He had previously

19   attempted to cancel his appearance at hearing.  A lawyer was appointed for him on account of

20   possible Fifth Amendment concerns.  He reiterated his reluctance to testify at all through a

21   motion to quash the subpoena.  Nevertheless, at the time of evidentiary hearing and the motion to

22   quash, Sweitzer indicated that he would answer "some" questions, and that petitioner's counsel

23   was "lucky" that he had decided to answer any questions.  RT (Evid.Hrng.) 20, 24, 25-26, 39-41.

24   Sweitzer was initially adamant that he would not incriminate other persons; he would relate what

25   petitioner said and did, or what he did not say or did not do.  However, by time of cross-

26   examination, and perhaps because he reacted to the questions on cross-examination posed by the

1    deputy attorney general, Sweitzer loosened his reluctance a bit.

2           On direct, vis-a-vis petitioner, Sweitzer repeated his declared assertion that

3    petitioner knew nothing about the carjacking which led to the murder, and had not participated in

4    the thought process, if any, leading up to the Honda Accord murder and attempted murder.  RT

5    (Evid.Hrng) 28, 29, 37,  38, 48.  As far as Sweitzer knew (but he had not been involved in the

6    discussion between Ellis and petitioner), petitioner had made no agreement to trade the gun for

7    rims.  Petitioner was looking for cash.  RT (Evid. Hrng.) 37-38.

8           In response to the court's questions, Sweitzer indicated that petitioner had

9    "exaggerated" [embellished] some of his testimony at the first jury trial.  Although it was

10   difficult to have Sweitzer specify what had been embellished, Sweitzer believed that petitioner

11   had made up some conversations.  RT (Evid. Hrng.) 44-45.

12          On cross-examination, certain impeaching statements were read or played on tape

13   for Sweitzer.  One such statement, taken from a transcript of a jail recording of Sweitzer and his

14   mother, indicated Sweitzer's displeasure with petitioner:

15              "And this mother fucker [petitioner] wants to say he ain't never
                been involved in shit.  He's a victim, and that he was terrified of
16              me and him, mother fucker *never once said he wanted to go home.*
                *If he wanted to go home, I would have took his bitch ass home.*  I
17              mean, he's the one who wanted some.  He's the one who wanted to
                fight.  He's the one who ended up with the fucking bike."
18

19   RT(Evid.Hrng.) 52 (emphasis added).

20   Sweitzer later said that he was angry and that he exaggerated a lot of things in 1997.  Sweitzer

21   also determined that the part of his declaration where he had heard conversations between Ellis

22   and petitioner regarding the possibility of trading rims for the guns was incorrect.  RT (Evid.

23   Hrng.) 59-60.  Sweitzer also said (contrary to Sweitzer's initial testimony about no

24   conversations) that petitioner and Ellis had said that they liked the rims on the Honda Accord.

25          Perhaps most impeaching of Sweitzer's federal testimony was that he told his

26   attorney that petitioner was lying:

                                              12

> Q.    And on the declaration it says that he being Josh Sweitzer said repeatedly that Matt Braden was lying, and that Matt wanted the tire rims, that David Ellis was going to get them for him as a trade for the gun that was used in the charged crimes.
>
> Do you recall Mr. Sweitzer telling you that repeatedly?
>
> [objections overruled]
>
> The Witness: He did say that.
>
> Q.  And do you recall in what context, or in specific instances when he did say that to you?
>
> A.  I have a recollection of him saying that during the trial when Matt was testifying, but I also know that when we talked about the case, and went over the police reports, when he was in custody, that this was the information that Mr. Sweitzer gave me.

RT (Evid.Hrng.) 91[4]

Sweitzer related at hearing that he was simply angry when he said this—and especially angry at petitioner because petitioner had determined to testify and "rat" on his co-defendants. Petitioner's counsel also attempted to show that Sweitzer often exaggerated when he was angry detailing Sweitzer's seemingly specious charges against his trial attorney.

   B. <u>Determination of Actual Innocence Issue</u>

   No one believes from the evidence that petitioner harbored any intent that Ellis shoot at the grey Honda Accord, nor does anyone contend that petitioner realized Ellis was going to shoot the victim before it happened.  The legal issue upon which actual innocence is based is whether petitioner shared in the intent to rob the persons in the Honda, presumably a taking of the car's rims, and perhaps the car and other available valuables.  Under California law, "[a]ll

---

   [4] Constance Gutwosky was Sweitzer's defense attorney.  She filed a declaration, initially filed as part of Sweitzer's <u>Marsden</u> proceedings, attached as Exhibit 6 to Respondent's answer. The declaration has become part of the record, and was never the subject of objection. Therefore, it was the proper subject of examination at evidentiary hearing.  In that declaration, Ms. Gutowski recounts that she had Sweitzer polygraphed and he showed deception in the area of whether he and the co-defendants (including petitioner) had any plan to shoot or carjack the victims.  Also "[h]e said repeatedly that Matt Braden was lying and that Matt wanted the tire rims and that David Ellis was going to get them for him as a trade for the gun...."

persons aiding or abetting the commission of burglary or robbery are guilty of first degree murder when one of them kills while acting in furtherance of the common design. (§ 189; <u>People v. Pulido</u> (1997) 15 Cal. 4th 713, 716, 63 Cal. Rptr. 2d 625, 936 P.2d 1235; <u>People v. Washington</u> (1965) 62 Cal. 2d 777, 782, 44 Cal. Rptr. 442, 402 P.2d 130.)"  <u>People v. Dickey</u>,  35 Cal. 4th 884, 900, 28 Cal. Rptr. 3d 647, 659 (2005).  As petitioner realizes, facilitation of the main actor's commission of  the underlying felony with knowledge of that actor's intent suffices for establishment of the basis for felony murder.  <u>People v Hodgson</u>, 111 Cal. App. 4th 566, 3 Cal. Rptr. 3d 575 (2003).  While sheer speculation that an aider and abettor knew of the actor's intent to rob will not do, the court is unaware of any requirement that the aider and abettor expressly voice an "I'm in on this;" circumstantial evidence may establish the aider's state of mind.  And again, the court must determine de novo whether petitioner has probably proven his innocence in this respect.  Thus, was petitioner simply along for the ride to Ellis' house, unsuspecting that any criminal activity would take place on the way, or did petitioner, by giving Ellis the gun, start in motion criminal activities he later had to have known were going to happen?[5]  Petitioner relies heavily on the federal testimony of Sweitzer and the state court testimony of  Engelleiter, but as the discussion below shows, he is selective about what to believe from these persons.

While petitioner has given the undersigned  pause in respect to petitioner's innocence, the evidence is insufficient for the undersigned to find probable innocence.  The court finds innocence possible, but guilt more likely.

\\\\\\

---

[5]  Petitioner indicates that the prosecution's theory was that petitioner had expressly indicated to Ellis that he wanted the rims, and that if the prosecution was proven wrong in this particular, the whole case must fall.  In reading the prosecutor's final argument, the undersigned does not believe that the prosecutor wedded himself to this one theory, but that petitioner's expressly wanting the rims was but one theory supported by the evidence.  The prosecutor also indicated that if petitioner knew of his co-defendant's probable method of operation to pay for the gun in general, he would also be guilty.  RT 342-343.  "And if the court is convinced as we are that his presence was intended to encourage these guys to act, then it's sufficient in our view."  <u>Id</u>.

Of course, petitioner did not initiate contact with Sweitzer and Ellis on the night of the murder.  In order to be found liable, petitioner must have formed the intent to facilitate the robbery (or attempted robbery) some time during or after the first meeting at petitioner's house. Petitioner relies heavily on Engelleiter's confirmation of petitioner's position that he would accept nothing less than cash for the gun, but a review of her testimony establishes that only for the moment was a cash only transaction contemplated.  In fact, her testimony does not establish that any firm deal had been made at that time. The precise contours of the murky "deal," and when precisely it had been made are not clear from all the evidence.  The record reflects no direct, firm representation on the part of Ellis that he actually had any money at home.

It is certainly possible from the evidence, however, that after petitioner brought out the gun in the backpack, he understood that he would be paid at Ellis' residence.  But petitioner also knew how Ellis and Sweitzer obtained their money—he absolutely knew that as the night wore on.  Given petitioner's presence and participation in several of the crimes committed that night (shooting in the park and driving the truck after the Mazda was stolen), petitioner may well have accepted a demand from Ellis that he would pay petitioner after the night's proceeds were sold, or finally accept a barter renegotiation on "really tight rims."  After all, petitioner was acquiescing in every other demand made by Sweitzer and Ellis that night. Moreover, petitioner had indicated to the police on interview that he was willing to have bartered the gun for stereo equipment.

But petitioner's case is aided by the fact that he did not have motive to participate in other seemingly spur of the moment, opportunistic criminal activity on the part of Ellis and Sweitzer, or he simply was not present.  This is true with respect to the shooting at Boss's house, a person not even known to petitioner, and the shooting at the first vehicle.  Petitioner argues that if he did not share in the intent to have these criminal acts performed, he did not have intent that the Honda carjacking  take place.  Petitioner argues, in essence, he should not be found to have

\\\\\

15

1   anticipated every impulsive, crazy criminal action by Ellis and Sweitzer who were truly

2   unimpeded by any conscience check on their actions.

3           However, when one adds in the facts relied upon by the trial court—petitioner's

4   assisting Ellis in a practice firing of the gun (as testified to by Engelleiter), petitioner's previous

5   participation in a burglary for guns (precipitated by Sweitzer), as well as a drive-by shooting in

6   which petitioner was the trigger man[6], and petitioner's lack of reluctance to deal in stolen goods

7   and weapons even while he is on bail for the previous offenses—protestations of intent

8   innocence become much more unlikely.  Petitioner participated, or not, throughout the evening as

9   he was present and available to participate.  Moreover, one can understand if petitioner was

10  surprised at the first, or even second, crimes of the evening.  But his unwillingness to extricate

11  himself afterwards (no matter whether he had to walk or hitchike or call another for a ride)

12  suggests that he was willing to be a part of whatever the main actors "planned."  There were

13  times during the evening that he simply could and should have walked away.  Even after he

14  witnessed a shooting by Ellis of the first [unknown] car early in the crime spree, he still hoped to

15  be able to sell the gun for money to Ellis.  Even after watching Ellis' brutal shooting at the

16  Honda occupants, he agreed to take back his gun so that he could still get money for it.  This is

17  the type of circumstantial evidence which weighs against a finding of actual innocence.

18          Further, the evidence shows that Sweitzer initially proclaimed petitioner's intent

19  to participate.  Sweitzer's relatively contemporaneous jail-recorded statements and statements to

20  his attorney implicating petitioner are  much more likely an honest reaction than a plot hatched

21  on the spot to get petitioner, i.e., he knew he was being recorded and knew that his false

22  statements would ultimately be used against the person he was furious with.  But there is no

23  evidence of such a plan on the part of Sweitzer.  Even if he was furious with petitioner at the

24

25          [6]  Petitioner conceded that he had fired a gun, but not at a house as he had been charged.
    Petitioner's responses on cross-examination appeared not to be credible.  Petitioner had also been
26  in the back seat of another car when a person named Pack fired a weapon and killed a person.

time he made the statements (doubtful), lying about petitioner had no point—why lie to one's

mother about one with whom you are furious if such a lie is not likely to be used against

petitioner.  Usually, one lies with a purpose in mind.

And, petitioner and Sweitzer's later testimony disagreed on key elements of the

Honda carjack.  Sweitzer testified to no plan whatsoever in his declaration and federal testimony;

petitioner clearly recollected conversations between Ellis and Sweitzer about following the

vehicle.  The court finds implausible that Sweitzer was acting as some type of automaton

receiving sub-conscious signals and instructions from Ellis about initially following the

car–shooting at the car– following the car again–and positioning it for the final shootout.

Disagreement on this key fact about what was said about the purpose of following the Honda

does not aid Sweitzer's testimony.  Sweitzer also was not honest in respect to his involvement in

the burglary petitioner had engaged in at Sweitzer's behest and for Sweitzer's benefit.

Petitioner urges that the sole purpose Sweitzer showed up to testify was to

exonerate petitioner, and that there exists no self-serving purpose in Sweitzer's testimony.

Perhaps he still did not like Braden, and such could be all the more reason for crediting

"exonerating" testimony.  Petitioner could be correct.  But Sweitzer's enigmatic appearance can

leave no firm impression in that regard.  It is equally possible that a time away from Pelican Bay

State Prison was reason enough to come and testify.  Sweitzer certainly did not testify to a

conscience clearing purpose as invited to do so by the undersigned.  Rather, all were simply

"lucky" to have received any testimony from Sweitzer.  His motivations for testimony remain

known only to Sweitzer.

Importantly, aside from the above credibility problems, Sweitzer's testimony, both

in declaration and in person, was not completely exonerating.  Although Sweitzer testified that

petitioner was not part of any carefully formulated, express plan to carjack the Honda, it is quite

possible from the above recounted evidence that petitioner had simply signed on in assisting

whatever opportunistic crime the two main perpetrators would attempt.  Sweitzer's

1   contemporaneous statements certainly indicate this.  There is no requirement that an aider and

2   abettor be as actively involved as the decision-maker or trigger person.  The law does not

3   recognize as lesser all lower levels of moral responsibility.  Facilitators can be as liable as main

4   actors.[7]

5              Neither is Engelleiter's testimony exonerating.  All that can be said about an

6   agreement by Ellis to acquire the gun from petitioner was her somewhat vaguely recollected

7   testimony that petitioner initially rejected the idea of bartering the gun for rims.  She did not even

8   know that an actual agreement between Ellis and petitioner had been made for Ellis to acquire

9   the weapon.  Even petitioner had indicated that he would be willing to trade the gun for stereo

10  equipment.  See RT 339.  As recounted above, Engelleiter did recall petitioner's active assistance

11  in instructing Ellis in use of the weapon.

12             Finally, petitioner's activity immediately after the crime does not suggest

13  innocence.  He accepted the gun back from Ellis with the comment that at least now he may be

14  able to get money for it—and indeed he nearly *immediately* attempted to sell this dangerous

15  assault weapon again.  He did not go to the police to clear his conscience—he expectantly waited

16  for their arrival.  Although petitioner testified to being sick to his stomach about the murder, his

17  actions spoke otherwise.[8]

18             Accordingly, the court cannot find from the record as a whole, including the

19  testimony from two trials and the federal proceedings, that petitioner has proven his probable

20  _____

21     [7] And, the court finds Sweitzer's "exoneration" of petitioner's involvement in stealing
    the Mazda insufficient.

22     [8] The undersigned also finds that petitioner's involvement in prior criminal activity
    detracts from his credibility in that petitioner's explanations for his involvement always paint
23  himself as the unwitting or unwilling participant.  With respect to the charged burglary,
    petitioner was simply accompanying another person who wanted a gun.  Next, he was simply
24  shooting "in the air," but was charged with shooting at an occupied dwelling.  Then, he was
    simply riding in another car when that person (Pack) fired a weapon and killed a person.  When
25  caught by the police on yet another occasion, with a gun at his feet, petitioner was unlucky
    enough again to have chosen a vehicle with a gun in it.  It is no small wonder that the trial judge
26  had credibility problems with petitioner's account on the night in question.

1  innocence as an aider and abettor to robbery, and hence innocence to first degree felony murder.

2      C.  Whether California Law Permits a Finding That Petitioner Was Guilty of

3      Felony Murder In Light of the Trial Judge's Findings Exonerating Petitioner of

4      Aiding and Abetting Attempted Murder

5          Petitioner next attacks as inconsistent the trial judge's finding of guilt for felony

6  murder of Mr. Tallman, but acquittal of aiding and abetting the attempted murder of his wife-

7  passenger in the Honda accord.  Petitioner has confused the mental states necessary to be found

8  guilty of aiding and abetting felony murder with that of aiding and abetting a target crime which

9  results in attempted murder.  This is so because there is no California crime of felony attempted

10  murder.

11          It is true that the trial judge found with respect to aiding and abetting attempted

12  murder that:

13          Count two charges an attempted murder on the life of Mrs.
           Tallman.  I find that the firing of the weapon the second time while
14          the vehicle was disabled on Arden Way was not the natural and
           probable consequence of what the defendant had expected to take
15          place.  And hence, he is not guilty of a violation of attempted
           murder under either the aiding and abetting or the conspiracy
16          theory.

17  RT 390-391.

18          California law is as follows.  In order to be liable for aiding and abetting

19  attempted murder:

20          As we pointed out earlier, under the general principles of aiding
           and abetting, "an aider and abettor [must] act with knowledge of
21          the criminal purpose of the perpetrator *and* with an intent or
           purpose either of committing, or of encouraging or facilitating
22          commission of, the offense."  (People v. Beeman, supra, 35 Cal.3d
           at p. 560, 199 Cal.Rptr. 60, 674 P.2d 1318, italics in original.)
23          Therefore, when a particular aiding and abetting case triggers
           application of the "natural and probable consequences" doctrine,
24          the Beeman test applies, and the trier of fact must find that the
           defendant, acting with (1) knowledge of the unlawful purpose of
25          the perpetrator; and (2) the intent or purpose of committing,
           encouraging, or facilitating the commission of a predicate or target
26          offense; (3) by act or advice aided, promoted, encouraged or

19

instigated the commission of the target crime. But the trier of fact must also find that (4) the defendant's confederate committed an offense other than the target crime; [FN4] and (5) the offense committed by the confederate was a natural and probable consequence of the target crime that the defendant aided and abetted.

People v. Prettyman, 14 Cal. 4th 248,262, 58 Cal. Rptr. 2d 827, 834 (1996) (footnote omitted).

"Natural and probable" means that the crime outside the target offense was "reasonably foreseeable." Id. at 261, 58 Cal. Rptr. 2d at 834 citing People v. Croy, 41 Cal. 3d 1, 12 n.5, 221 Cal. Rptr. 592 (1985).

While one could disagree with the trial judge that attempted murder was not a reasonably foreseeable consequence of armed carjacking (robbery), the undersigned accepts the finding. However, felony murder is different than aiding and abetting a target crime that results in attempted murder. "The purpose of the felony-murder rule is to deter those who commit the enumerated felonies from killing by holding them strictly responsible for any killing committed by a cofelon, whether intentional, negligent, or accidental, during the perpetration or attempted perpetration of the felony." People v. Cavitt (2004) 33 Cal. 4th 187, 197, 14 Cal. Rptr. 3d 281, 288 (2004). First degree felony murder encompasses not only deliberate murder, "but also a variety of unintended homicides resulting from reckless behavior, or ordinary negligence, or pure accident; it embraces both calculated conduct and acts committed in panic or rage, or under the dominion of mental illness, drugs, or alcohol; and it condemns alike consequences that are highly probable, conceivably possible, *or wholly unforeseeable.*" People v. Dillon , 34 Cal. 3d 441, 477, 194 Cal. Rptr. 390 (1983) (emphasis added). Thus, for felony murder as opposed to aiding and abetting attempted murder, the actual killing does not have to be a natural and probable—foreseeable—consequence of the underlying felony.

Petitioner is incorrect in his opinion that the trial judge's finding that the attempted murder was unforseeable renders defective a conviction for felony murder arising out of the same robbery (carjacking). This claim should be denied.

D. <u>The Trial Judge Did Not Violate Clearly Established Supreme Court Law In Admitting</u>
<u>Evidence of Petitioner's Prior Criminal Activity</u>

Petitioner was on bail at the time of Tallman's murder in the Honda Accord.  He had been charged with burglary and shooting at an occupied dwelling.  RT 2.  The burglary involved a situation where petitioner and another person (Pack) took guns and other valuables from the dwelling of Sweitzer's stepfather; petitioner had been apprised of the existence of the guns by co-defendant Sweitzer on an earlier occasion.  Petitioner was also charged with shooting at an occupied dwelling.  Although petitioner had not been convicted of these charges, indeed, these charges were trailing the murder trial, all agree that California law did not require a conviction for prior criminal activity to be utilized.

Petitioner does not challenge in his petition the use of the shooting at a dwelling evidence, only the burglary evidence.

After a lengthy discussion with counsel, primarily on the burglary evidence, the trial judge ruled:

> I disclosed to you a few minutes ago informally that I intended to allow the evidence.
> And the reasoning is as follows– that intent is the only issue in this case.....
>
>       ***
>
> Obviously where intent is an issue the requirement that the bad acts be similar is greatly relaxed as opposed to cases in which prior bad acts are being offered on identification or even on common plan and scheme....
>
>       ***
>
> Very important in my thinking is that in both instances in addition a gun was the medium of exchange or intended exchange.  In the burglary Sweitzer received a guns (sic) in exchange for conveying the information to the defendant about the location and suitability of premises for the burglary.  And in this case it is claimed that this incident took place in a[n] effort to get the rims to get money so that Sweitzer could buy a gun from the defendant.[9]  Also important to my thinking is that the co-defendant in this homicide

_____

[9]Actually, as the facts demonstrate, it was Sweitzer's friend, Ellis, who wanted to buy the gun.  However, with respect to the criminal activities of the night in question, Sweitzer and Ellis were an indistinguishable team.

1    case is Sweitzer, the very same person who conspired with the
     defendant to commit the burglary.

2  RT 33-34.

3         The trial judge went on to relate how very probative this evidence was to

4  determining petitioner's "assistive" larcenous state of mind on the night of the murder, and

5  hence, so very important to the trial judge.

6         First of all, post-AEDPA, it is an open question whether admission of evidence

7  merely to show propensity to commit the crime violates the Due Process Clause.  The Supreme

8  Court has never so held, and McKinney v. Rees, 993 F.2d 1378 (9th Cir. 1993) is pre-AEDPA.

9  See, e.g., Estelle v. McGuire, 502 U.S. 62, 75 n.5, 112 S. Ct. 475, 484 (1991).  ("[W]e express no

10 opinion on whether a state law would violate the Due Process Clause if it permitted the use of

11 'prior crimes' evidence to show propensity to commit a charged crime").  Thus, even if the trial

12 judge was incorrect, and propensity evidence was admitted, such is not actionable in this petition

13 governed by AEDPA because use of propensity evidence does not violate clearly established

14 Supreme Court precedent.

15        Nor, of course, does it matter that state law was violated, if it was violated.

16 Estelle v. McGuire, 502 U.S. at 67-68, 112 S. Ct. at 480.

17        Moreover, even if it were appropriate to make a decision on the merits of

18 relevance, and hence, fundamental fairness, the undersigned cannot find that admission of the

19 burglary was irrelevant.[10]  The prosecution was required to show at the very least that petitioner

20 possessed the mind set that he was "in" for whatever criminal activity the two main perpetrators

21 conjured up; his actual assistance to the main perpetrators in giving them a gun, driving the

22 perpetrators' truck so that they could drive a stolen car, and not getting the gun back was beyond

23 cavil.  The critical issue was why he lent such assistance.  The fact that he had conspired in the

24 fairly recent past to commit criminal activity with one of the co-defendants where a gun was the

25

26      [10]  There is no doubt that this evidence weighed heavily on the mind of the judge in his
     final decision.  RT 383.

1  medium of exchange was not irrelevant.  It clearly showed his willingness, metaphorically, to

2  "run with the bad dogs," and in the process, he acquired the intent of a "bad dog" himself.

3  *Conclusion*

4          ACCORDINGLY, after comprehensive review of the file and the new evidence

5  presented, the undersigned recommends a denial of the petition for writ of habeas corpus.

6          These findings and recommendations are submitted to the United States District

7  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

8  days after being served with these findings and recommendations, any party may file written

9  objections with the court and serve a copy on all parties.  Such a document should be captioned

10 "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

11 shall be served and filed within ten days after service of the objections.  The parties are advised

12 that failure to file objections within the specified time may waive the right to appeal the District

13 Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

14 DATED: 11/29/05

15

16                                         /s/ Gregory G. Hollows

17                                         _____
                                           UNITED STATES MAGISTRATE JUDGE

18 GGH:gh:035
   brad1595.157

19

20

21

22

23

24

25

26